Good morning, we have a day calendar today consisting of three cases to be considered, followed by argument in a pending motion. The motion will be held until we've completed the day calendar. The clerk has informed us that all counselors have signed in, that there is a lawyer in the motion part who is new to the case and who will make an application for admission pro acvice, and we will hear that motion for admission pro acvice just before we hear the actual motion in 18-3485, Oberland v. USA. Okay, so we'll turn to the first case on the day calendar, USA v. Jacques Durand. Good morning, Your Honors, may it please the Court, Malegre Glasshouser representing Mr. Durand. Mr. Durand's questioning here was not routine. It was not part of an administrative procedure. It was not during processing. It wasn't in anticipation of booking. When was he actually booked? Three months later. For the federal charges? For the federal charges. When they left him, he was arrested by the postal inspectors, right? He was picked up off the street by the postal inspectors and brought to their federal inspection office, and then after the interrogation without Miranda, he was brought to local authorities. They didn't book him then, the local authorities? I don't know exactly what happened by the local authorities, but the federal inspectors, when they were interrogating Mr. Durand, were not in the process of booking him. They were just interrogating him and failed to give him Miranda rights. I did see there was a reference somewhere, I forget where it is now, but that there was a pending state prosecution against him at the time that was referenced, I think, in the report of the interview by the postal inspectors. That's why they took him over across the street. You don't know what that was or what happened the rest of that day, whether he was actually brought in and booked on the state charges or he'd been booked earlier on some charges? Do you know? I believe that he was processed by the local authorities that day, but there are no facts in the record. He was already in process. He wasn't booked? Your Honor, I don't believe the record is quite clear on what happened in the local court, but what is important when Your Honors are looking at what happened during the questioning is what the federal inspectors were doing. There's no indication here that the federal inspectors were asking Mr. Durand questions in relation to a totally different jurisdiction's booking process. I found what I was thinking about, it's in a criminal complaint that was filed in September in the federal action. It says, paragraph 10, on or about June 9th, 2015, which is the date of the interview, Durand was arrested in connection with a criminal matter pending in the Nassau County First District Court, but you don't know anything more about that. I guess I'd have to ask the government what that was all about, whether it was in connection with this case or something else. Well, it certainly wasn't this case. The two jurisdictions are separate, and I think that matters here when considering what the federal inspectors were doing. They weren't doing any sort of standardized federal booking process, and they weren't doing any state booking process either, and that's different than all of the cases that I've found where this circuit, or indeed any of the cases that either of us have cited, rely on a routine booking exception to Miranda, and that makes sense. The cases that rely on that exception note that the interrogators, the agents, are going through a standard form. They're asking questions just in the order of the form. There's no indication that they're doing anything other than filling out arrest processes. Would you agree that if he was being processed by the two inspectors at that time on June 9th, these were appropriate questions, including, what's your phone number, and if that phone didn't work, we'll try another phone? If they were really booking him, isn't this petty reinformation? I wouldn't agree. I wouldn't agree for a few reasons. First, even when somebody is going through a formalized booking process, if the agents are actually asking questions for an investigative purpose, that still is interrogation under Miranda, and that's clear from this court's decision, and Rosa, and really, I believe, all the decisions, just because it's a booking process, the agents can't ask questions that they know, in this particular case, will elicit incriminating answers. At the moment, when they tried the phone, it didn't work, and they said, tell us your real number, they were asking in an investigatory capacity, not an information gathering. That's correct, Your Honor. These agents knew, through their investigation, that phone numbers were crucial to their case, and they knew that what Mr. Dran said in answer to that question could be crucial to their case. And when looking at the facts of what happened here in this interrogation, it has all the hallmarks of a regular interrogation. They accuse him of lying, they confront him when they don't believe his answers, and they keep asking him questions until they get the answer that they are looking for. Well, what if we agree with you? What do we do? We send it back for a suppression hearing? No, Your Honor. You can find on these facts where it's clear that no Miranda was given, and that if Your Honor agrees with me that it was interrogation, custodial interrogation, that his statement should be suppressed, the conviction should be reversed, and it should be sent back for further proceedings. We can make that decision that presumably would involve evidentiary determinations. You want us to make that decision, as opposed to sending it back to the district court to make appropriate findings? You want us to make the decision that you're appealing, right, the district court's refusal to suppress. That's correct, Your Honor. But how do we do that? Like Judge Cabranes asked. I mean, we don't know. I saw in the testimony of one of the inspectors at trial that he thought there were five or six phone numbers at the time that they were . . . they set off alarms during the interview. But we don't . . . even though it's an objective test, we don't really know much about how many phone numbers they had, whether this was one of the phone numbers, whether they actually filled out any forms at the post office that had pedigree information. Wouldn't that be relevant to whether it should be suppressed or not? We do know the answers to those questions Your Honor just articulated. This phone number was on the list, and they were not filling out a form. We have the information that they produced in relation to that interrogation, and it is not a form. So if Your Honor finds that Miranda should have been given because either this wasn't booking or processing, and there's no evidence that it was, and or that they were asking questions that were investigative in nature, then his statements must be suppressed. No Miranda was given. But what if they had gotten a pedigree form from the state court across the street, the district attorney's office, or the county sheriff's office, county police office, and they were just filling out the form, wouldn't that be handing it over to the county detectives or something like that? Wouldn't that be relevant to suppression? It might be, but that's pure speculation. There's no evidence that happened here, and we're not working with no information at all. I think we have a lot of the information. We know how the interrogation went because the agents testified at trial about what happened. We know the forms that they filled out because they were attached to, it was a report of the defense attorney's motion to suppress the evidence here. We're not missing facts about the processing, and also the government had the opportunity already to introduce any facts they thought were relevant to the district court's determination about whether this was processing, and they failed to do so. They just say it's processing, but point to no facts at all that indicate that Mr. Durand was booked or processed, and as Judge Cooler points out, he wasn't booked or processed by those authorities for three more months. The other thing that makes this case different than the cases that this court and others have found are under this exception is that the agents here should not have been surprised at all by the incriminating nature of Mr. Durand's answers. This is not a situation where an answer that seems innocuous is later found to be incriminating because they knew phone numbers were crucial, and the other cases where the exception applies rely on this element of surprise. For example, one of them that the government relies on, Rodriguez, the questions actually weren't incriminating until the person later returned to the country using a fake name. Then his previous answer about his real name became incriminating. That's not only a surprise, but it just wasn't incriminating at all. I would argue in the words of, I think, the Supreme Court, that this question was designed to elicit an incriminating response under the guise of asking a pedigree question. Is that your argument? It's part of my argument, Your Honor, but also it's not pedigree because they're just not doing a routine processing here. This was just interrogation, and when Mr. Durand has read his Miranda rights, he exercised those rights immediately. You're asking that we reverse the decision not to suppress, and then send it back to the district court for further proceedings consistent with that decision? Correct, Your Honor. The government could decide to retry him or not. The court can decide to, I don't know, I suppose that's not our decision, that's up to the district court. That's correct, Your Honor. Well, what has been the result? Where does the case stand right now? Mr. Durand is incarcerated. He's incarcerated, pursuant to a sentence imposed by the district court, right? Correct. For how much time? 51 months. 51 months.  Mr. Durand, because, of course, the slate will have been wiped clean, right? What jeopardy is he in at that point? Does he not run the risk of a more severe sentence, certainly a new sentence, if he's convicted, right? What I'm getting at is very simply this, Ms. Glasshouse, have you discussed this case with your client as to what can happen if he has this spectacular victory before the Court of Appeals? All right. I always discuss my cases with my clients, Your Honor, and I don't think that the district court . . . He knows that he runs the . . . there's a risk that he may be tried upon remand. He was tried already and sentenced, so I'm not sure what the . . . Well, what is it that you want from it? Let's go back to find out what it is you want from us. You want us to reverse and enter judgment for him. On the suppression. On the suppression issue. Yes, Your Honor. No, no, no. I'm talking about the judgment of conviction. Right. Reverse the judgment of conviction. That's right. So it's not just a question of reversing a determination with respect to a search. You want us to enter judgment for him, and therefore, he prevails altogether. Well, no, he would still face possible retrial. Well, that's . . . Yes. Oh, sure. That's my point. We go back full circle. He faces the possibility of retrial, right? Correct, Your Honor, but without the statement . . . Why is that good for him? Maybe you can give us a general explanation of why a criminal defendant should deeply desire to be retried. Because right now, he is serving a sentence of 51 months, Your Honor, and . . . And you think that if we reverse, that he's going to prevail at this putative trial? The information that was taken from this interrogation, in the government's words, cracked the case open. So the statements we're talking about suppressing aren't some small, ancillary thing. They are the crux of the case against them. So your view is that it's highly unlikely that the government would pursue another trial? I don't . . . You have no view on it. I would not speak to the government, but Mr. Drenth's chances of success in future proceedings without his un-Mirandized interrogation are dramatically different than his chances were originally. Right. Okay, great. Thanks very much. Thank you, Your Honor. So what, in your view, is going on here? Good morning, Your Honors. My name is Matthew Higgins. I represent the United States in this case, and I prosecuted the case at trial. I believe the question presented for this Court is the same question that confronted the Postal Inspectors on the date of the June 9, 2015, arrest, which is, did they know, or should they have known, that the content of their questions was reasonably likely to produce an incriminating response? Once they try the first phone and it doesn't work, it seems to me they have changed their mode from gathering information to investigatory. I don't believe it means they've changed their mode from a pedigree gathering exercise to an investigative exercise, Your Honor. However, the encounter did not start with the question about the phone number. The encounter started with much more basic pedigree information, and the officers on this record, as both officers testified at trial, had an increasing concern that the pedigree information was incriminating and uncandid about his pedigree information. He was reticent to provide his social security number, although he confirmed it when the officers said, we think this is it, is this it? So you feel that the fact that he's reticent on some things that we all agree are pedigree information gave the Postal Inspectors the right to investigate further his answers? Under this Court's holding in Rosa v. McCrae, Your Honor, the officers have a duty to press upon responses that they believe are either false or unreliable. In that case, the circumstances presented were somewhat similar. The same officers who were responsible for the underlying investigation, which in that case were the officers conducting the booking interview. So they had the knowledge in their heads of what the nature of the case was. Can we all agree that this wasn't a booking? This wasn't an interview leading to booking? No, Your Honor. The government contends that it was for the phone. When did the booking take place? It happened immediately after this interview. He was booked where? By whom? He was booked in Nassau County on state charges. This was an investigation overseen by the Postal Inspection Service. The arrest was undertaken by officers of the Postal Inspection Service. And Inspectors McKechnie and Belfort had principal responsibility for the investigation. Once they arrested him on state charges? He was arrested on state charges. He was booked in Nassau County that day. Do you know what the state charges were? I believe it was related to credit card fraud, a grand larceny charge under the New York Penal Law. I do not know the exact statute under which he was charged. However, that case was ultimately, I believe it was ultimately dismissed in deference to the federal prosecution. When he was booked across the street, did they do the pedigree form information? Do you know? I do not know the answer to that standing here today, Your Honor. He wasn't arrested on the federal charges until September, right? A federal complaint? The federal charges were not filed until September, Your Honor. And the federal charges also encompassed charges that had neither been filed in state court or could not be filed in state court. For example, as a result, the defendant was ultimately indicted on an aggravated identity theft charge, which to my knowledge is not available in the state court. He was merandized by whom, by which agent? He was merandized by the postal inspectors at the conclusion of the pedigree portion of this interview on June. And then he was asked to speak to a lawyer. That's correct, Your Honor. We may assume that he might not have given the telephone information if he was merandized before that. I think we, I think this court could assume that any time a defendant is merandized, they will decline to provide additional information. This information was so crucial, as opposing counsel said, it broke the case wide open. I believe there is some nuance to that, Your Honor. It's clear on this record that the identification of this telephone number and its association with this defendant was an important development in the case. Well, you said in your summation, didn't you, that it was, that it broke the case wide open? Yes, Your Honor. The association of this telephone number with the defendant absolutely did constitute a very important development for the strength of the government's case. However, that association was available to the government by alternative means. The defendant was carrying the same wireless device, the cellular telephone, in his possession on that. Are you arguing eventual discovery? That is one of our arguments, Your Honor. How did you make that argument below? Didn't you waive that argument? We did not, the argument was not made below, in large part because it was not necessary as the district court granted, denied the defendant. Prudence might have. You knew that this was a case seeking suppression. Prudence might have argued for you to argue eventual discovery below. You can't make an argument for the first time to the court of appeals. This court has the authority to affirm a judgment on any decision, excuse me, on any basis presented in the record and the search warrant under which the device in question was ultimately searched and this same telephone number was identified, was part of the record below. It was part of the discovery. The government at trial introduced both the device and the limited result . . . I understand, but if it were not for an overeager postal inspector, you would have, in the fullness of time, gotten your search warrant and found information about that phone, but he asked for the number in advance of Miranda warnings given to this defendant. He did . . . And you never made the argument about eventual discovery before the district court. Your Honor is correct. The record does not contain that argument before the district court. However, the government does not believe the postal inspectors were overeager here. The government believes the postal inspectors were within their authority under this court's decision in Rosa v. McCray and similar decisions in which the officers are entitled to press an arrestee when the booking information provided to them appears to be unreliable. In that case, it was the defendant's . . . the arrestee in that case, it was his hair color. The officer said, what is your real hair color? And it ended up being a very important item of identification information that corroborated the statement of the witness, the victim in that case. This case is at least one dimension removed from that in the fact that the officers did not ask, is this specific number your telephone number? They did not ask from this list of six or seven or eight telephone numbers that are relevant to the various credit card . . . But they asked, what is the number of the phone you're carrying? And they knew if they needed it, that they could get a search warrant for that phone because they had the phone in their own possession. So what was the rush to get him to identify the phone? That's the very purpose of Miranda, to keep defendants, potential defendants, from giving information that is harmful to themselves without being warned of the consequences. The only reason it got to that point, Your Honor, is that the defendant provided a telephone number that was a non-working number after . . . I understand. I understand. That's when it turned investigative in my view. There's no holding of this court, and I'm not aware of a holding, that requires the officers to be continuously on guard for when any question might conceivably start to trammel into potentially incriminating information. The officers, the inspectors in this case, did not have a particular basis to believe that the device was assigned a number that would end up being so important, any more than the officers in Rosa had a basis to believe that the hair color would end up being so important, or that in other cases, such as Hines or Gatchis, that marital status or employment would end up being so crucial. I would also add that identification and attribution of particular statements, particular devices, particular social media accounts, in this day and age, is a part of almost any criminal case, and a holding that requires officers to refrain from asking these types of questions in the booking context, as this was, potentially creates an issue where officers are unable to ask any questions that might go towards identification. They ask traditional pedigree questions, that's what the rules have been, and it's only the district court, the one district court case that Judge Glasser cites, which included telephones anyway in what is traditionally viewed as pedigree information. That was an outlier case when he decided it. We haven't decided it, our court, and no other district court has followed that. I see my time has expired. Let me respond. Please go on. Thank you. Cell phones are a relatively new development in the grand sweep of this court's precedent, but if we look back at some of the factors, at some of the questions that were deemed necessary as pedigree information, either because of a need to contact the defendant, a need to identify associates of the defendant who might be able to vouch for them at a bail hearing, a need to identify the defendant's ties to the community, marital status, employment address, a cell phone is at least as relevant to those queries, to those issues, as those same queries were. Let me ask a question that is one I think you knew you were going to get, which is, you said before the district court a couple of times, I think we need a hearing here, and there was no hearing. How do you feel about that now? The government was, I think, clear on this record, the government was prepared to hold a hearing on this issue. You said the court may need to hold a hearing on this. The court would have to hear testimony from officers to address it. You're familiar with that? Yes, Your Honor. Clearly, I was prepared to have a hearing, should the court — You just made inevitable discovery as an argument at that hearing. We had the phone, Your Honor. We had the phone. I could have made such an argument at such a hearing, however — What's your view now, then, about that? Do you still feel there should have been a hearing or no? The question presented as to whether or not there should have been a hearing is a little different from the standard of review applicable to the suppression question in direct, which is that would be a de novo review. Here on the decision to hold a suppression hearing, it's up to this court's determination as to whether that was an abuse of discretion. And while the government was certainly prepared to hold a hearing, I don't believe there are sufficient facts in the record to conclude that it was an abuse of the district court's discretion. Did the defendant ask for a hearing? I believe the defendant did request a hearing, Your Honor. So that was effectively denied or just not acted on? Either way, it was effectively denied. There was no hearing held. You were speaking about the record before in response to Judge Pooler's questions, and I wanted to just make sure I understand this. The search warrant, it's not appended to your brief, is it? Where is the search warrant? I believe the search warrant is appended. If I may have just a moment, Your Honor. I believe it is in our appendix. Yes, it's government's appendix. One is the application, and the warrant itself begins at 15 in the appendix to the government's brief. The appendix to the government's brief. It was filed, I believe, on the docket in the same PDF, so it appears in the same ... It should appear in the same ... In the red brief, right? Correct, Your Honor. In the red brief. In the red brief. Okay. I have some questions about that. So aren't we effectively ... We're effectively ... Ah, yes, here it is. Aren't we effectively supplementing the record on appeal? That is, was this ... Why is it being done ... It goes to the question of inevitable discovery, I guess. This is all before the district court? The search warrant certainly was. The defendant did not move to suppress it. I would also add that during the course of Inspector Belfort's testimony, the government introduced both the device itself, as well as a limited printout of the results of the examination of that device, for the sole purpose of identifying the telephone number assigned. But the affidavit in support of the search warrant recounts his identification in his interview of that number. That's correct, Your Honor. An important part of the search warrant application, would you agree? It is. Certainly. The defendant's admission of his telephone number is an important part of the case, but I don't believe the government has any ... It's an important part of the search warrant application and affidavit in support of the search warrant application. It's certainly added to the quantum of probable cause in the application. However, it only appears in one paragraph, and there are numerous references drawn from the bank records that identify that telephone number as appearing on multiple either applications for credit card accounts and other persons' names, or upon the call records of when the credit card company would receive a call inquiring about the account that number appeared. The commonality of the appearance of that number across those multivariate accounts is something that stood out to the investigators and would have stood out to them in the absence of the defendant's admission that it was his telephone number. All of that is a long way to say, based on the search warrant, we know what happened in this case because we have a search warrant, and the results of that search warrant were introduced at trial. The government might be taking a longer walk to get to that result, but the government gets to the result that this telephone number is associated with this defendant, inevitably. Now, why don't you address my earlier concern with Ms. Glashauser. If she prevails before us, what would the situation be? I understand it's a hypothetical in large measure, but how would that affect his fate and your prosecutorial stance? Well, if this court were to remand for a question hearing... It's a hypothetical. The hypothetical is that Ms. Glashauser obtains whatever it is she's asking for. If this court were to vacate the judgment, the government would have to retry this case without the benefit of the defendant's admission of his telephone number. I think it's important to note that the defense did not challenge below, nor have they challenged here, numerous other admissions that the defendant made during the course of that booking interview that the government used at trial, particularly in summation, to highlight his lack of candor and therefore his consciousness of guilt. All right, so let's limit it to exactly what's before us, this particular inquiry as to which his counsel objects in this appeal. So that's the hypothetical. She prevails. Ms. Glashauser prevails completely. What's the prosecutorial stance at that point? The government would have the option to retry the case with the exception of one count on which the jury acquitted. I anticipate fully that the government would seek to retry that case, and I'm confident that we would win that case, notwithstanding that we're not raising a harmless error argument here because the record fairly supports that the government viewed this as important evidence before the jury. The quantum of evidence identifying the defendant by an eyewitness, the defendant's appearance on multiple items of surveillance video at multiple places, multiple days, we would certainly have enough evidence to go to trial. And how about saying that cracked the case wide open? Again, I would contend there is some nuance in that. It's the association of the telephone number with the defendant that cracked the case wide open, and certainly the defendant's admission in a pedigree interview after having made multiple uncanny statements that that was his telephone number got the government to that result much more quickly. But the government gets there in the end. But help me follow my hypothetical, if you would. So it's back to the district court, and you're prepared, under this hypothetical, to pursue a prosecution of Mr. Duren. What, in your view, would be his exposure in those circumstances? Were he to be convicted in this putative, hypothetical trial? He would face the same counts, with the one exception I highlighted. I do not believe there would be a — I don't know if the sentencing guidelines have changed. If they change to his benefit, then he would have the benefit. If they change to his detriment, that would potentially present an ex post facto problem. It's a long way of saying I don't — standing here now, I'm not thinking of a detrimental change to his status, other than perhaps — If he were convicted again and re-sentenced for any time he served on this first conviction, wouldn't he? I would imagine he would get credit for that time, yes. Do you know how many months of his term he served? He was taken into custody at the taking of the verdict, which I believe was June or July of 2016, so he served approximately 30 months, more than half of the sentence imposed, perhaps more than two-thirds, if one assumes the traditional good time credit. If the panel has no further questions — To address some of the questions about inevitable discovery, I think there are a number of ways that the Court can find this wasn't inevitable, but one that hasn't been mentioned is that the only reason the government thought that this particular phone with this particular number — The only reason they had that number to put in the search warrant and say this number is associated with all of this other stuff that we have probable cause about was Mr. Duran's statement. Without that statement, it's not even clear they would have taken his phone, that they would have had probable cause to seek a search warrant to the phone because they did not know what number was on it. So it's pure speculation to say they would have found this out anywhere. The other thing I'd like to address is the government's suggestion that this would somehow be a novel ruling from the Court. The Court's ruling in our favor would follow very clear precedent that Miranda is required before questions that are designed to elicit an interrogating response. That's what we have here. There's a narrow exception for booking, and the government relies heavily on ROSA, but in ROSA, the officers were filling out an online booking sheet. They were sitting in front of a computer asking questions and entering in the answers in the order that they appeared on the booking sheet. That is not the circumstance. I thought in ROSA, though, that the victim the previous day had said the person who attacked her had brown hair with blonde tips, and then they found him the next day. He had totally blonde hair, and that's why they kind of pressed him on it, because those were the same detectives that took the statement the day before from the victim who said that was the color of her hair. So I would say you would argue it's more similar to here where they knew this number had some significance ahead of time, just like his hair color had significance other than what's your hair color. I don't believe that's true in ROSA, because I believe it's the interpreter who's asking the question who is not the agent that knew anything about the case. It's the Spanish interpreter. It's my understanding I could be misremembering. I thought it was the Spanish-speaking officer who was doing it, one of the two detectives, no? I could be misremembering that, but in ROSA, it's a question on the standard form, and he's going through that form, and that's not what we have here. There's no form. There's no standard paperwork that's being filled out, and telephone numbers are also not something that are part of the normal pedigree information, and it's not because of cell phones. People had telephone numbers before they had cell phones. This isn't a novel thing. It's not in the list of standard questions that... If they develop a form, as they do for Miranda, if they develop a form for future use and include the telephone of the person, you'd have no problem in theory with that. And he was being questioned as part of his booking and processing, and the investigators in the case had no reason to think that the questioning of this particular person would elicit an incriminating response. Maybe. Thanks very much. We'll turn to the next case, which is United States v. Kevin Parker. Thank you. Thank you. May it please the Court, my name is Mary Ann Wirth, and I represent Kevin Parker on this appeal. The government does not dispute that the district court erred in calculating the base offense level here of 26 under Guideline Section 2K2.1 based on two prior felony convictions for a controlled substance offense. That error is repeated in the government's Pimentel letter, the government's sentencing letter, and the probation report itself. The PSR got it wrong as well. And instead, in response, the government on appeal is switching course and now arguing that that base offense level of 26 applies based on two prior felony convictions, one of which is an assault to conviction. And they attach to their brief a judgment and plea minutes that are not in the record below. Would you agree that if it had been in the record below, it would satisfy the second conviction? I can't make that concession, Your Honor. That conviction was not vetted, examined by the defense below, and the defense counsel has to have an opportunity to investigate that conviction itself to verify that it's accurate. And I think most importantly, in my experience, when there is an adjustment in the guidelines based on prior convictions, it's very important for defense counsel to examine that particular conviction and be prepared, if appropriate, to make mitigation arguments based on the nature of that conviction. But if in substitute for the second drug conviction that was in the PSR and the mental letter, you had an assault in the second degree where someone was injured with a deadly instrument, I think it was. There are no facts in the probation report, Your Honor. No, but I'm looking at the, it's attached to the government's brief, the sentencing transcript. Do you admit that in the city of Yonkers, Your Honor, about July 10, 1999, it's on addendum 8 to the red brief, with intent to cause physical injury to another person, you did cause such injury to a person by means of a dangerous instrument, which seems to track one of the subsections of the assault, New York assault statute, that would qualify as a crime of violence. So my question is, if this were before the district court, it would seem to satisfy that second offense. And third, my second question is, how would it help him to be resentenced when instead of a drug conviction, the second countable conviction was this assault with injury? I understand. Yes, that is in the transcript. It's an accurate rendition of the transcript. And my point is, this is not a new development. This is information that was available to the government, could have been put in correctly, you know, in the record. I don't know, you know, what a defense examination would show of this particular prior conviction. You know, that, for example, the judgment doesn't identify the particular subdivision. I agree that that language is there in the plea minutes, but as I noted, how could it help him? I understand the question. I think that defense attorney to adequately represent a client has to know the underlying facts of that particular conviction and be prepared to argue in mitigation that perhaps it's not as serious it might seem on its face, and therefore the court should consider that in deciding whether to make it clear that, you know, there are rules. The government does nothing more serious than have to deprive a defendant of his liberty. The rules have to be applied. There's a rule, a federal rule of appellate procedure that defines what is in the record. This is not in the record. This court's case law as recently as this year in the Toth case makes it clear that only in a probation report is wrong for one thing. For better or for worse, it's wrong. And, you know, he's entitled to have a probation report in the system that's accurate. And he's entitled to have the benefit of every argument that his defense attorney can think of. This person got the top of the guideline sentence in the guidelines range on a plea, on a guilty plea. There's a reason for that. And he's entitled to every argument that can be made in his defense in mitigation. And he should have that opportunity on remand to dispute this if need be and to raise any arguments on mitigation that he can raise. We're talking about these documents which are before us as part of the red brief. Can't we take judicial notice of this, of these documents? Is there something wrong? I mean, this is part of the record, as it were. I understand the question, and I will answer it. But there's a rule. And the rule says this is what's in the record. This is not in the record. And my point is, I would say no, you shouldn't take judicial notice of it because you have to give the defense the opportunity to respond to this. You have to give a defense lawyer an opportunity to examine the accuracy of this. I am not in any way casting aspersions on the government's integrity here, but the defense has a job to do. And the job is to make sure that this is accurate. And in addition to that, to explore with the client whether there are any mitigating factors that can be raised to tell the court why this particular conviction may not seem as serious as it may seem on the face of it. It's just leaving no stone unturned on behalf of this client. Were you this defendant's counsel before the district court? No, Your Honor. And that brings me to the second point, which is also on a topic of accuracy. And that is the argument with respect to the error in the probation report. Another error, which again is following this defendant throughout the system, which is that there was no basis for a variance from the guidelines. That's in the probation report. The government pointed it out in their sentencing letter. And the defense responded by first talking to the probation officer, determining that that was in fact an error. And the probation officer said, can't do anything about it at this point. Final probation report has been rendered. You have to talk to the district court. At which point, defense counsel writes to the district court and says, there's a substantial variance recommended here by probation, 156 months. The government correctly points out that there is no reason articulated in the probation report for that substantial variance. Please ask the probation officer to amend the report and give the reasons for that substantial variance that's recommended. And the district court... While we're on this for a moment, if you just bear with me, I'm trying to understand the record. I have the pre-sentence report before me. Yes. And the pre-sentence report contains an enumeration of these various offenses, including assault to the head, assault to the head, and assault to the head. And this is at the age of 21. This is paragraph 50 of the PSR. So that's before the court, right? The conviction is not the particular subdivision. And the question is whether this qualifies as a crime of violence. And that is very much a function of which subdivision he was convicted under. And that does not appear in the PSR. But you're not seeking a reversal of the conviction just for the sentencing? A remand for resentencing, yes. A remand for resentencing. That's correct. So my second point is the error in the probation report, going back to that for a moment. Well, I shouldn't be asking you, I should be asking the Governor what it could do or should do to get it right. What, in your view, should it have done to get it right, in your view? This is an error on the part of the district court. The district court should have ordered, it's the simplest thing in the world, ordered the probation officer to remove that error from the probation report, which said there's no basis for a variance, and follow the rule. It's a statute. It's Rule 32, D1D, which says the PSR must identify the basis for a departure. This PSR does not. That defendant is entitled to have that departure, reason for that departure identified. Why? So that the district court can hear those reasons, and to, so the defense counsel has another argument in his favor. This is a huge thing for a defense lawyer to say, probation agrees with me that a departure is warranted here, and here's why they think it's warranted. And to have those reasons articulated is not sufficient for the district court to say, you know, it's up to me, it's not up to him. The statute provides that those reasons have to be given, those reasons were not given, the request was made, the request was denied, and that was error. Of course, you're missing something here, which is that the probation officer recommended a sentence of 156 months, right? Because there was this argument with the district court, why won't you talk to the probation officer to see why he or she went down so low to 156, because at the time of the PSR, the range was much higher than the district court finally arrived at, because of that attempted murder. Remember that? So if you look at page 17 of the PSR, the guideline range is much higher, right? So that was an even greater departure from what the guideline range was. Yeah, the range was 292 to 365, and it was capped, I think, at 240 months, because it's two 922G counts, right? Right. But, I mean, it's not that the probation officer wasn't indicating there should be a variance, it's just that she didn't indicate why it should be a variance for a sentence that would have required a variance to do that. Do you agree with that? There's an inconsistency in the report, because the report says, A, no reason for variance, and B, here's what we recommend, which is lower. But my point again is that this statute requires her to give a basis for that, and she doesn't. Government agreed to that, pointed it out. The defense jumped on that error and asked for it to be corrected in a timely manner. I find that this error is compounded by the fact that both the defense and the district court got the probation officer's recommendation flipped around wrong. The defense argued, and the court agreed with it, that the recommendation was ten years on count two, when in fact it was three years on count two. So that particular recommendation should have been explored. The reasons for it should be on the record. The defendant is entitled to that. For the court to hear that information, the statute requires it. And for the defense lawyer to effectively represent his client, he needed to have that information. And then my final point, just briefly, that the district court also erred in failing to apply the section 3553A factors to his determination not to grant the defense application that he run the sentence concurrently with any anticipated probation violation sentence. And again, the district court did that on principle, that it's an anticipated sentence. I don't think it's appropriate to do that. That clearly violates the application note to 5G1.3, which says when there's an anticipated sentence, it's in the district court's discretion to run it . May it please the Court, Jessica Feinstein for the United States. The judgment of conviction should be affirmed because the district court did not commit plain error here in its calculation of the sentencing guidelines. The counsel is seeking to overturn the judgment of conviction, just the sentencing. There is no plain error here put simply because the defendant's substantial rights were not affected because the outcome would have been the same in the absence of the error, that is, the sentencing guidelines calculation for. There's no question in your view about the application of the plain error standard? No. There's no question in our view. I think this Court has been clear many times that when a defendant could have received the exact same sentence in the absence of the alleged error, then you cannot say that its occurrence affected the defendant's substantial rights. What about what your opposing counsel just said, though? At least he should have had the opportunity to have a qualifying conviction for a crime of violence, comparing it to the New York statute, but it was never before him, his lawyer, or the Court. What about the argument, well, look, he should have at least had a chance to attack it. The first we've ever heard of it was on his appeal. Well, a couple things, Your Honor. The reason these records weren't below is because there was no objection below. Second of all, Your Honor, I'm not really sure what investigation there was to do. It's pretty plain from the plea allocution that the use of force was one of the elements of the assault conviction, and so it plainly is a crime of violence. From the state plea allocation that we're talking about here. Yes. I understand defense counsel's argument that they could have raised mitigating factors for maybe why this offense wasn't as bad as it actually was, but that doesn't go to whether it's a qualifying offense for purposes of Section 2K2.1 under the guidelines. Did I just ask you about the criminal history reference, too? In your footnote, you mentioned that we also believe that it was clear it was this assault conviction that we were talking about because it shows up in the criminal history report and the defense lawyer had it. Was that an NCIS report you're talking about? Yes, that's correct, Your Honor. One of the rap sheets that are typically run and handed over in the discovery, and it did note the subsection of the New York Penal Law 120.05 subsection. How are we supposed to know that? We don't even have it. That's correct, Your Honor. It's more in response to the defense's argument, just that for some reason this wasn't a, the guidelines calculation wasn't correct here. The defendants are raising a plain error argument, and so we just want to point out why that's not the case and why also it wasn't a mistake for defense counsel not to object to the ultimate outcome here in terms of the guidelines. But how do we do that if we haven't even seen the NCIS report? I understand, Your Honor, and we can certainly move to supplement the record there, but I don't hear defense counsel challenging that that was the case, that in fact there was a criminal history report that was provided to the defense and did include that subsection. So is the problem is if you run it now, it probably shows up the right way, but we don't know what it was run years ago? Is that it? Do you have a record on it? Because you would think like with that transcript of his sentencing in the state assault case, you attached it to your appendix, but you didn't do it with the NCIS report that supposedly his lawyer had at the time and the government had. It's not a shepherdized document, Your Honor. I think that's why we didn't append it. That's the only reason. We're referring to the document that was provided to defense counsel as part of discovery. So if it's not a shepherd document, why mention it? Simply in response. Just one more thing. In response to why there was no mistake by defense counsel below. What were the so-called shepherd documents in this case? So if we're talking about the New York assault conviction, there's two of them. One is the plea colloquy, the transcript that's appended to our brief, and the other is the judgment of conviction. The judgment of conviction, I don't believe, has the exact subsection of the penal law, but the plea colloquy, the judge actually, when asking him how he pleads, walked through what the elements were and listed them. That was before the district court? No, none of that was before the district court. It's a problem, no? Well, Your Honor, basically it's plain error here, Your Honor. I understand. So in other words, if we were to go back, it would end up in the same result. These documents would be put before the judge, he would look at them and determine it's a crime of violence, and then we'd end up at the same sentencing guidelines. But it's your view that we can, on appeal, consider these documents, even though they were not before the district court? Yes, Your Honor. I mean, I think you could take a notice of them, judicial notice, as Your Honor suggested. We don't have authority for that from the Court of Appeals, right? I'm not sure, Your Honor. I think that sounds correct to me. It's typically something that happens in the trial court. But the reason these documents weren't in the record wasn't for some, you know, they weren't withheld intentionally by the government. It's just that this issue didn't come up. That's why they weren't in the record. And that's the purpose of the plain error standard. If there are no further questions from the panel, I'll rest on our papers. Thank you. Ms. Worth, you've reserved some time. Just a few brief points. The reason that the defense didn't object to this conviction below is because it was never proffered as the basis for the application of 2K2.1. You know, the government made a mistake here. The government made a mistake in its sentencing letter, its payment tell letter, the probation report compounds that error. There was no reason, you know, for the defense. And I did argue that it was ineffective assistance of counsel for defense counsel to miss this point as well. We can't really consider that. I understand. I understand that, but I think it is on the face of it. We have some cases which require, among other things, that previous counsel who were charged with having been ineffective should get notice that that claim is being made before the court of appeals. Have you given notice to that lawyer, whoever it was? No. He's willing to fall on his sword. He's a lovely man, I'm sure. But no, I haven't discussed it with him at this particular point. If there are no further questions, thank you. Thank you, Ms. Worth, very much. We appreciate it. All right. We'll hear counsel in Roth against the County of Nashua. Good morning, Your Honors. I think the Court should reverse the collateral estoppel decision because the identical issue was not actually litigated in the Article 78 case. But he raised it in the Article 78, didn't he? Well, you know, when you look at the... Attorney. What did you say, Your Honor? Attorney in the Article 78? No, I was not. I'm only his attorney here in the appellate court. Again, it was the county's burden of proof to demonstrate the issue was identical. If you look at what they pointed to in their appellate brief here, he made one reference to the ADA in his actual petition that he filed in the Article 78 case. He didn't appeal the denial, though. He didn't appeal the denial of it, but I don't think that's germane, Your Honor, to the collateral estoppel issue in terms of its identity. I think this is... If you look at what the district court ruled on the last page of its decision, the judge said here the commissioner disqualified Roth because it found he was not able to perform the duties of his position. That's true. And he said in the Article 78 judge found this decision was supported by substantial evidence. As such, the factual issue of whether plaintiff was qualified to perform the essential functions of his job has been decided. I agree. And he is precluded from relitigating that. But the issue here is the ADA claim is more complex. We have the with reasonable accommodation inquiry. And that's the part of the test that was never litigated and certainly wasn't decided by the Article 78 court. But in the Article 78 decision at 810, it says the counsel for respondents asserted both the essential function, the purpose for the physical exam, determined essential functions of the police officer position with or without an accommodation. So that was at least raised before the state court judge in the Article 78 proceeding, right? It was raised. But again, I think that raising in that manner of the Article 78 judge really just kind of regurgitated with the parties that argued in their memorandum of law. I don't think that's enough to show that it was actually decided in the prior proceeding. Wasn't the responsibility, though, of the candidate to, if he was relying on the reasonable accommodation aspect of it, to do more than to bring it before the attention of the state court judge to say what I'm really focused on here is reasonable accommodation? I don't know if it was his responsibility. But again, I don't think that goes to the issue of the identity on the collateral estoppel argument. To me, it's like this. This is what I would say, Your Honor. Let's say in this case, let's say Roth brought the same case, Article 78. He said something like, hey, if the county had said, for example, you didn't get the job, it had nothing to do with your disability. You didn't get the job because you didn't score high enough on it. And Roth himself said, no, I didn't get the job because I had diabetes. And the Article 78 case made the same decision. It said it was a rational decision supported by substantial evidence to county. That, I think, would be collaterally estopped here. The difference in my case is the ADA claim is more complex. In our case here, the county acknowledged we denied him the job because he has diabetes. That raised squarely the with reasonable accommodation issue. And I think if the court looks at this record, there are these references. There's one reference in the petition. As Your Honor said, there's a couple references in the Article 78 decision. But it really doesn't show that that with reasonable accommodation inquiry was actually litigated in the Article 78 case. And the reason why it shows it is because the record doesn't even identify which of the essential functions of the police officer job the county said Mr. Roth couldn't perform. And that really is central to the with reasonable accommodation inquiry. Well, the doctor did, though, right? The doctor listed him, the second doctor. Yeah, but the doctor didn't say all these functions he can't perform A and B. They just listed all the functions of a police officer and said he can't do the job. And that was for the EOC intake form, too. And he said, you know this, he said, is there anything, did you ask your employer for any changes or assistance to your job because of your So wouldn't that be a reasonable accommodation statement? Yeah, I think it is a with reasonable accommodation statement. But again, I don't think that that could be a different reason maybe to say, hey, you should have raised this. Maybe the county could argue if it was a different procedural posture that somehow they should be excused from having failed to offer it. But again, Your Honor, I don't think that goes to this issue on collateral establishment. Let me put it this way. Here's what makes the ADA claim different. If this was a race discrimination case instead of a disability discrimination, I probably would have no argument. But the fact that the ADA is a more complicated statute, it squarely presents the concept of because it's not the same thing as to say, well, we didn't give you the job because you were white or we didn't give you the job because you're a male or female. You know, the problem with ADA is the county is entitled essentially to say, hey, we're not going to give you the job because you have diabetes. But then under the federal statute, it says that you have to offer reasonable accommodation to enable the person to be able to do the job. And that's what makes this kind of discrimination claim a lot even if Mr. Roth cannot perform the essential functions of the police officer job, whatever functions they are. The county could still be liable under the ADA by failing to have offered a reasonable accommodation. And it's really on that discrete basis that I think that the judge erred in applying collateral estoppel. He almost applied collateral estoppel. He was correct on the last page of the decision with regard to what was precluded, that factual part. But I think the judge erred by then saying, and then the whole ADA claim goes out the door. It doesn't, because he could still win, Mr. Roth, if he says, hey, maybe I couldn't perform the running or the climbing or whatever it is the county says, but you didn't offer me with the reasonable accommodation that the federal statute requires you offer me. If the court has any further questions, I'd be happy to answer them. Thanks very much. Thank you for hearing the case. May it please the court, my name is Catherine Smith-Santos, and I represent Defendant Appali, the county of Nassau. The narrow issue presented here on appeal is whether there was disability discrimination that he previously raised, litigated, and lost in the state court proceedings. You appeared in the article 78, didn't you, Nassau County? Yes, we appeared on behalf of Nassau County, that's correct. And the state court rejected Roth's disability discrimination claims in finding that the county's decision to disqualify Roth was based on whether Roth was qualified to serve as a New York City policeman, but not qualified to serve as a Nassau County policeman? Roth did make the argument before the state court that he was accepted into the NYPD. He was accepted, I believe, in January of 2015, began training. He didn't actually go on patrol until June of 2015, which was June of 2015. We do not know from the record what medical documents were presented to the NYPD. There is evidence from Roth's personal physician, Dr. Herson, that Roth asked him to pull certain medical records and not give them to the NYPD because they showed that his diabetes was worsening. So the NYPD, we don't know what medical records they had in front of them. Is he still a New York City policeman today? I believe that in 2017, which is again after the county rendered its decision, in 2017, I believe he switched to the University of Connecticut police force. Is he still working as an active policeman? I don't know where he is at the present. That would be a question for his counsel. Roth has conceded, as you heard here today, that the state court determination that he could not perform the essential functions of an entry-level police officer job is subject to collateral estoppel. He attempts to make a distinction without any valid difference when he argues that he can relitigate the issue of whether he could not perform the essential functions of the entry-level police officer job with or without accommodation. This is exactly the determination that was already made in the state court. Did Article 78 proceeding, in your view, fully address the question of whether he could perform the essential functions of the job with or without reasonable accommodation? Yes, it did. It was the standard that was applied from the beginning. It's the standard in the governing regulations that the county doctors followed in examining Roth. It was the standard in the ADA, the standard in the state court equivalent, which is the New York State Human Rights Law, and the standard that was advocated over and over again in the briefing to the state court, both by Roth and by the county, that the essential element of the disability discrimination claim was whether he could perform the essential functions of the police officer job either with or without accommodation. And the district court correctly determined that the issue of disability discrimination was necessarily decided in the prior state court action. The law does not require that the disability discrimination claim should be rejected, however, in order for it to be precluded, as was held by this circuit in Dutro versus New York State Gaming Commission, which was cited in our briefs. The standard for disability discrimination under both federal and state law is well known. It clearly includes the concept of accommodation. And in order to find in favor of the county and reject Roth's central disability discrimination claim in the Article 78 proceeding, the state court necessarily decided that Roth could not perform the essential functions of the police officer job with or without accommodation. The state court applied in its opinion New York State Civil Service Law, Section 50, which also incorporates the definition of disability under the New York State Human Rights Law. In Paragraph 10 of Section 50, it refers to Executive Law Section 292, which is the codification of the New York State Human Rights Law. And that definition of disability under the state law does include the concept of with or without accommodation. These same issues were raised in the state court and in the federal court, and the federal court properly found that these issues raised, litigated, and lost by Roth in the Article 78 proceeding were identical to those he attempted to relitigate in federal court. The district court further properly found that the identical facts underlay both the federal and state court proceedings. The state court did examine evidence presented by the county that essential functions of the entry-level police officer job include locating, pursuing, and arresting suspected criminals and rescuing individuals at accidents, emergencies, and disasters. That's in the State Court Opinion Appendix, page 812. These essential functions are based on regulations found in 9 NYC RR 6000.9, and they were, as Your Honor pointed out earlier, relied on by Dr. Rosenball in rendering his decision with respect to Roth's medical qualifications. After examining Roth, Dr. Rosenball warned that the severity and uncontrolled nature of his condition, combined with the stresses of these essential job functions, would make Roth a danger to himself and the public. In the state court proceeding, the county therefore produced persuasive evidence that Roth could not perform the essential functions of the job, either with or without accommodation. It was Roth's full and fair opportunity to contest that evidence, to submit evidence proving his own case, and any failure of him to do so should not be admitted at the county's door. Therefore, the district court properly found that the identical facts underlay both the federal and state court proceedings. In closing, the county's main concern in this case is public safety. It does not want to run the risk that an armed police officer, perhaps while in pursuit of a criminal suspect, could go into hypoglycemic shock, losing consciousness, and losing control of a dangerous situation. Therefore, we request that this court affirm the order of the district court below. Based on the second physician to examine him, Rosenball, he set forth a couple of what seemed to be essential functions of the job. Is there a possibility of reasonable accommodation for a new police officer as to those particular tasks of a police officer? Was it addressed at all? As was found by the Fifth Circuit in Atkins v. Salazar and the Seventh Circuit in Darnell v. ThermoFiber, producing evidence that the severity and uncontrolled nature of a diabetic condition prevents a job applicant from performing the essential functions of the job with or without accommodation is enough to defeat a disability discrimination claim. In other words, no accommodation is possible to cure or correct an applicant's own failure to manage his health condition. And the multiple seizures that were apparent on the record here are the four seizures that he underwent were of significant concern to Dr. Rosenball, who is a board-certified endocrinologist who does understand the condition of diabetes. The reason I ask is because his argument now seems to be the reasonable accommodation rather than the essential functions part of the disability definition. I'm a little surprised that although it was mentioned in the 78 petition decision by the Supreme Court, there's not a real lot of discussion about it, that's for sure. How do you explain that? Because nobody really thought there could be a reasonable accommodation for those functions. Do you know? That's correct. The county produced evidence that no accommodation was possible to correct Ross's own mismanagement of his health condition. And under the Fifth Circuit and Seventh Circuit cases that I mentioned, failure to control cases, which did look at applicants with uncontrolled diabetes, that's enough to defeat an ADA claim. There is no accommodation that's possible under those circumstances. Thank you very much. Very briefly, Your Honors. I know the court understands the issue in the case. And I appreciate the county's position, but the fact is, if you really just look at this record, this with reasonable accommodation inquiry, it just wasn't litigated and it wasn't an article 78 decision. I mean, the judge, and I said this in my brief, the judge just cites administrative law, and essentially all the judge says is the county had a non-arbitrary basis, a rational basis, to say, oh, Mr. Roth couldn't do the essential functions of the job. It has nothing to do with reasonable accommodation inquiry. And I think, Your Honor, to answer your question before, you said, well, how come the with reasonable accommodation inquiry didn't come up? Like, if you look at the appendix on page 831, this is the actual verified petition he filed in the article 78. Look, for example, like paragraph 46 or 47. It seemed to me when I read his petition, he essentially was saying, I'm not disqualified at all. I mean, the fact that I have diabetes doesn't render me unfit or unable to do any part of the job. That's just ridiculous. So, granted, the article 78 court said, hey, the county had enough evidence to say, no, we believe you can't do it. And I'm not contesting that he can contest that again. But that doesn't answer the question under the ADA, which is, even if they had a basis to say that, did they fail to offer reasonable accommodations? And on that score, that's why the collateral estoppel ruling is bad. It's almost like the judge, he said there was no race judicata, the district court judge, but he essentially applied a race judicata. He didn't limit collateral estoppel to the discrete factual issue that was actually determined in the article 78 case. Thank you very much for hearing the case. Thank you. Thank you to both counsels. Well argued and very appreciated. And we'll turn to the pending motion entitled In Re Grand Jury Subpoena, Oberlander et al. v. United States, No. 18-3485. Thank you. I understand that Attorney Feeney would like to present an application to appear Pro Hac Vici. Mr. Feeney? I was asked on, I believe it was Tuesday afternoon at about 5 o'clock, to appear on behalf of Mr. Oberlander and Mr. Lerner. I am not admitted in the Second Circuit, although I am admitted in the district courts and in the states. You're a member of the bar of the U.S. District Court for the Southern District of New York? And the Eastern, and admitted in New York State. Unfortunately, yesterday was an unanticipated holiday, so there was no opportunity for me to come to the courthouse yesterday to seek to be admitted, in addition to which yesterday was essentially my day to prepare to come here and argue this case, which has been going on for seven years, which in and of itself was a bit of a challenge. So I would ask the Court to admit me Pro Hac Vici. Do you have a chance to read the whole seven-year record? No. Even reading all the papers associated with this appeal was a little bit of a challenge. However, with Mr. Oberlander's assistance, I think I was able to come up to speed to what I need to know. Fine. With the agreement of my colleagues, Mr. Feeney's application to appear Pro Hac Vici is granted. It will be followed up with a motion. Thank you, Your Honor. If the Court prefers, I would be happy to file an application to be admitted for purposes of this hearing. All right. Now, perhaps, Mr. Bellis, you should perhaps speak first, because we have to raise the question of whether any conversation today involves grand jury matters as to which we have to take special caution. Good morning. I am Rick Bellis, appearing on behalf of the United States. I am an AUSA in the Northern District of New York. However, today I'm appearing as a Special Assistant U.S. Attorney for the Eastern District of New York involving this litigation. To begin with, Your Honors, the government does not oppose Mr. Oberlander's motion for a stay of the course of a fine, or an expedited briefing schedule. That would be fantastic, Your Honor. So, in effect, the motion that is pending can be granted, absent objection, and we can expedite the appeal pursuant to an order that would issue from the clerk's office after today's hearing. That would be great, Your Honor. That makes any discussion here moot. Is that your view? I think so for today, Your Honor. Okay, fine. Mr. Feeney, you've won your first motion. If I would just point out, Your Honor, Mr. Oberlander was advised May it please the Court, I apologize. Mr. Oberlander was advised on today's Thursday, I believe it was Tuesday, on the day that we were called about coming here, that the U.S. Attorney's Office has delivered a subpoena, a new subpoena, to the FBI. We don't know if it's just a redated subpoena. I am advised, Mr. Bell, that it's the same subpoena substantially in terms of what it requests. Nothing new then before us, right? Well, the question would then become, Your Honor, this is a case that's been going on for seven years. This particular subpoena that this motion is about relates to a subpoena that the grand jury that it was issued for had expired. Mr. Feeney, this may all be very important, but you've won your motion. I usually adopt that rule, Your Honor. As soon as you win a motion, you head for the door. I usually adopt the rule that when you win or when the judge is doing your work for you, you should sit down and be quiet. All right. You can go back before Judge Hall of the Eastern District of New York or any other appropriate district court and you will be heard in the fullness of time. But this particular motion, is there anything left to this motion that requires expedited briefing? I would say yes, Your Honor. Fine. We will give you all the process that is due. You can be assured of that. And we will enter an order very soon to give you an expedited briefing schedule. On the merits appeal. Thank you very much. We'll reserve decision. We're adjourned. Court is adjourned.